UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**ROBERT M. VANCE,**

                        **Plaintiff,**

                **-v-**                        **3:11-CV-1443 (NAM/DEP)**

**ACCO BRANDS USA, LLC,**

                        **Defendant.**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:

Hartnett Law Office, P.C.
Peter M. Hartnett, Esq.
499 South Warren Street
Syracuse, NY 13202-2609
Attorney for Plaintiff

Hinman, Howard Law Firm
Albert J. Millus, Jr., Esq.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250
Attorney for Defendant

**Hon. Norman A. Mordue, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Plaintiff Robert Vance, a hearing impaired individual, alleges that defendant discriminated against him based on his disability in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of his disability in regard to," *inter alia*, "discharge of employees . . . and other terms, conditions, and privileges of employment" and to "discriminate

against any individual because such individual has opposed any act or practice made unlawful by" the ADA.  42 U.S.C. §§ 12112(a), 12203(a).  In his second amended complaint (Dkt. No. 47), plaintiff alleges that defendant ACCO Brands USA, LLC ("ACCO") subjected him to disparate treatment and a hostile work environment because of his hearing impairment, retaliated against him for complaining about such conduct, and finally terminated him in retaliation for his complaints.

Presently before the court is ACCO's motion (Dkt. No. 55) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rules").  As discussed below, the court finds that defendant's motion should be granted and plaintiff's second amended complaint dismissed.[1]

## FACTUAL BACKGROUND

The facts, unless otherwise noted, are undisputed and are supported by the record.[2]  Plaintiff was born with a 75% loss in hearing.  (Rule 7.1 Statement ¶ 9).  He began working at ACCO's[3] Sidney facility in July 2004 as a third shift shipper/picker/packer in the Distribution

---

[1]  Defendant has also filed a letter motion (Dkt. No. 69) requesting that its motion for summary judgment be granted by default.  The court has concluded that defendant's motion (Dkt. No. 55) should be granted on the merits, therefore, defendant's letter motion is denied as moot.

[2]  Defendant properly filed a Statement of Material Facts pursuant to Local Rule 7.1 ("Rule 7.1 Statement") (Dkt. No. 55-1).  Plaintiff responded to this statement (Dkt. No. 71), but in many responses failed to set forth specific citations to the record.  Plaintiff also filed a Counter-Statement of Material Facts (Dkt. No. 78-1, 78-2), which, as defendants note, was improperly filed.  This counter-statement did not raise issues as to which there was a dispute, instead raising 45 pages of facts as to which plaintiff contends there is *not* a dispute.  Defendant objects to this document, but nonetheless responds.  Similarly, the court will not strike this document, but has read the depositions, affidavits, and documents submitted by the parties, will read this document in the context of the entire record, and will not deem any of these facts admitted simply because they appear in this document.

[3]  At the time, the facility was owned by MeadWestvaco Corporation, but was later acquired by ACCO.  Although ACCO did not own the company for the entire duration of plaintiff's employment, for clarity, and because ACCO is the defendant in this action, the court will refer to the company as "ACCO"

-2-

Department, where manufactured products are sorted, packaged, palletized, and shipped. (*Id.* at ¶¶ 4, 10, 11). Janine O'Hara manages this department. (*Id.* at ¶ 4). Although there are a variety of tasks that employees in this department may perform, the positions all have the same pay grade. The level of pay is determined by seniority, not position. (*Id.* at ¶ 12).

One of the positions involves operating material handling equipment. Due to the nature of the operation, second shift employees in this department are engaged only in this task; on the other hand, a limited number of employees (approximately 30 out of the 150) on first shift do so. (*Id.* at ¶ 13; Pl. Counter-Statement at ¶ 13). Plaintiff sought a material handler license, but was initially denied this license. Some employees apparently expressed what plaintiff believes are unjustified safety concerns about plaintiff operating this equipment. (*Id.* at ¶ 16, Pl. Response ¶ 16). Robin Halaquist, who has been employed in the Human Resources Department since 1986, investigated the situation, concluded a license should be issued, and notified the ACCO's security officers. (Rule 7.1 Statement ¶¶ 14, 16). On September 10, 2007, the Union filed a grievance on plaintiff's behalf alleging that he was not being trained in the various positions in the department due to his disability. (*Id.* at ¶ 17). The supervisor responding to the grievance stated that the decisions regarding training and which tasks are performed "is Management's decision . . . [and] based on management needs." (*Id.* at ¶ 19). Although plaintiff agrees that there was no formal rotation requirement, he believes others were trained and/or rotated while he was not. (*Id.* at ¶ 20, Pl. Response ¶ 20).

In March 2008, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff claimed that he was discriminated against based on

---

in this decision.

his disability because the company did not rotate him among the various job tasks.  In July 2008, ACCO entered into a settlement agreeing to, *inter alia*, acknowledge plaintiff's disability, and meet with him regularly, and stating that their "plan [was] to rotate [plaintiff] through each job function of shipper, picker, packer," and provide necessary training."[4]  Subsequent to this agreement, Ms. Halaquist, Daniel Fenton, the plant manager, and Craig Biondi, then Director of Human Resources, met with plaintiff regularly.  (*Id.* at ¶ 23).  In these meetings, plaintiff consistently complained regarding his relationship with co-workers and the resulting environment, a lack of training, and the fact that he was not rotated from position to position.  (*Id.* at ¶ 27).  Plaintiff frequently failed to provide names of the co-workers about whom he complained.  (*Id.* at ¶ 28).

Plaintiff filed a second charge of discrimination with the EEOC on February 13, 2009, which he amended on March 18, 2010, alleging that he had not received adequate training, and that he had been retaliated against as a result of filing the charge.  (*Id.* at ¶ 41).  This charge was dismissed on September 13, 2011.  Plaintiff filed his original complaint on December 9, 2011, again alleging disparate treatment, hostile work environment, and retaliation.  (*Id*. at ¶ 43).  The union filed another grievance on plaintiff's behalf on January 2, 2012, alleging that he was subjected to a hostile work environment.  (*Id.* at ¶ 44).  He filed a third charge of discrimination with the EEOC on June 29, 2012, which was dismissed on July 27, 2012.

On June 3, 2013, plaintiff was assigned to a station near a female temporary employee.  (*Id.* at ¶ 56).  As a result of an incident that occurred the previous Friday between this employee

---

[4] At times plaintiff's claims regarding rotation among the various positions appears to be that defendant violated this settlement agreement.  However, as defendant notes, plaintiff did not plead a claim for breach of contract.

and another temporary employee, plaintiff believed that he was going to be "caught in a 'risk or set up'" by being placed next to this employee. (*Id.* at ¶ 55, 56, Pl. Response ¶ 56). Plaintiff asked his supervisor, Alice Gonzalez, to move the temporary employee. (Rule 7.1 Statement at ¶ 56). Ms. Gonzalez told him that she would not move the temporary employee, but would move plaintiff. (Pl. Dep. at 191). Plaintiff objected to this solution.[5] (*Id.* at ¶ 57). Ms. O'Hara arrived, and plaintiff explained his situation, Ms. Gonzalez "got upset," and Ms. O'Hara attempted to "fix th[e] situation." (Pl. Dep. at 191). The temporary employee was moved, plaintiff was permitted to remain in his seat, and Ms. O'Hara returned to the area to check on plaintiff that afternoon. (Rule 7.1 Statement at ¶ 61). Ms. O'Hara, Ms. Gonzalez, and a union shop steward in the area, Kathy Oswald, felt that plaintiff was highly agitated and angry, and "kept pointing at Ms. O'Hara and approaching her, forcing her to back up." (*Id.* at 58). Although plaintiff disagrees with these employees, it appears undisputed that based on their perception, the incident was reported to Ms. Halaquist in human resources. Consequently, plaintiff was suspended with pay pending an investigation, during which Ms. Halaquist obtained statements from Ms. O'Hara, Ms. Gonzaelz, and Ms. Oswald. (*Id.* at ¶¶ 64, 65). ACCO subsequently terminated plaintiff's employment, stating that this incident was the basis for the termination.[6] (*Id.* at 67, Pl. Response, ¶ 67).

## DISCUSSION

**A.     Standard on Summary Judgment**

---

[5] The parties dispute additional details about this incident, for example, defendant states that plaintiff "flew into a near rage," however, the facts as described above are undisputed.

[6] Plaintiff also apparently had issues with his attendance, and, at the end of May 2013, was close to termination for this reason. However, the June 3, 2013 incident occurred before this occurred, and attendance is not the stated rationale for plaintiff's termination.

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate.[7] *See id.*

Courts have acknowledged the dangers of summary judgment in discrimination cases: "Because direct evidence of . . . discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted). A plaintiff must, however, provide more than conclusory allegations of discrimination to defeat a motion for summary judgment. *Id.*

**B.    Disparate Treatment**

Plaintiff argues that he was treated differently than other employees because of his disability in violation of the ADA. More specifically, he contends that he was not trained and rotated among positions like his co-workers. The Court reviews the record under the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1974).[8] The first

---

[7] The court notes that defendant takes issue with the majority of plaintiff's submissions in his opposition to defendant's motion. (*See generally* Def. Reply Brief). While defendant is correct, and many of these documents are not in the proper form, or do not contain the appropriate information, the Court has reviewed all submissions, including the entire record, and even if the documents were in proper form, the outcome would not be different.

[8] Although *McDonnell Douglas* involves a race discrimination claim brought under Title VII, courts have applied the same framework to disability discrimination claims. *See, e.g., Platt v. Inc. Vill. of*

step in this analysis requires a plaintiff to prove, by a preponderance of the evidence, a prima facie case of discrimination by the employer. *See, e.g., Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999) (discussing burden-shifting approach in Title VII context). If plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If defendant articulates a legitimate, nondiscriminatory reason, the burden shifts back to plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision, and that disability was the true reason. *Id.* at 446-47.

        1.        Prima Facie Case

To establish a prima facie case, under the *McDonnell Douglas* burden-shifting approach, plaintiff must show that: (1) his employer is subject to the ADA; (2) he was disabled under the ADA; (3) he is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *See, e.g., Sista v. CDC Ixis N. Am.,* Inc., 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)). The Court concludes that plaintiff cannot show that management decisions regarding rotation were adverse actions that occurred because of his disability.

With respect to the third element, an adverse employment action is a "materially adverse change in the terms and conditions of employment that is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). An adverse employment action need not entail economic loss; however, there

---

*Southampton*, 391 F. App'x 62, 64 n.1 (2d Cir. 2010).

must still be a link between the discrimination and some "tangible job benefits" such as "compensation, terms, conditions or privileges" of employment. *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal citation omitted).  For example, termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities, would be considered materially adverse changes. *Demoret*, 451 F.3d at 151.  On the other hand, inconvenient scheduling that does not have any negative career consequences, is not adverse. *See, e.g., Mark v. Brookdale Univ. Hosp.*, No. 04-CV-2497, 2005 WL 1521185, at *26 (E.D.N.Y. 2005).

Plaintiff's claim of disparate treatment centers around his desire to be rotated among more positions in the department.[9]  The Court concludes that plaintiff's desire to be rotated among more positions does not constitute an adverse employment action as it was not a materially

---

[9] Plaintiff also claims that his work was criticized more than other employees.  Despite the fact that plaintiff's memorandum of law consisted solely of boilerplate employment discrimination law with no facts or analysis, to the extent plaintiff alleges that this scrutiny was, by itself, an adverse action, the court will briefly address it here.  There is no evidence that any punishment that he received resulted in any material alteration or disadvantage with his employment.  This alleged disparate scrutiny, by itself, does not constitute an adverse employment action because it did not affect the compensation, terms, conditions of privileges of his employment. *See Eldaghar v. City of New York Dep't of Citywide Admin. Servs.*, No. 02 Civ. 9151, 2008 WL 2971467, at *5 (S.D.N.Y. 2008).  "District courts within the Second Circuit have often found . . . 'that reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.'" *Abraham v. Potter*, 494 F. Supp. 2d 141, 147-48 (D. Conn. 2007) (citation omitted); *see also Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (allegations of verbal abuse, insults, or unfair criticism are not adverse employment actions); *see also Weeks v. State of N.Y.* 273 F.3d 76, 86 (2d Cir. 2001) ("It hardly needs saying that a criticism of an employee . . . is not an adverse employment action" where there is no evidence that the criticism had any negative ramifications for the employee), abrogated on other grounds, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Although plaintiff complains about a number of warnings that he received, the record does not show that any of these caused a decrease in salary, change in title, loss in benefits, or any other changes in his employment status.  Moreover, as will be discussed in more detail below, defendant has offered a legitimate nondiscriminatory reason for these warnings and plaintiff has not adduced sufficient evidence to show that this reason was a pretext for discrimination.

significant disadvantage with respect to his employment.  Although in some situations, a job transfer may qualify as an adverse employment action, here, the reassignments did not involve a change in pay, benefits, or seniority, and there is no evidence that they placed plaintiff in a position "that was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement."  *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000).  Plaintiff's only attempt to establish that he was harmed by the lack of rotation is his conclusory allegation that he would be more marketable to future employers if he had more experience.  He was not, however, denied any advantages at ACCO by not rotating among all of the positions in the manner he desired.

Moreover, as defendant notes, plaintiff's assertions regarding rotation are vague and difficult to reconcile.  At times he contends that other employees were rotated and he was not, while at others, he contends that no employees were rotated and they were not pleased that he was asking for rotation.[10]  In an attempt to demonstrate that other employees were rotated while plaintiff was not, he states "Plaintiff observed that other employees with less seniority . . . were operating equipment on the 1st shift." (Pl. Counter-Statement at ¶ 26.).  However, a review of the documents cited demonstrates that plaintiff believed that this was because those making the rotation decisions "pick their friends," not because of plaintiff's disability.  (Dkt. No. 77-17 at 7; *see also* Dkt. No. 77-21 at 6 ("'It is about getting their friends a job.'")).  Plaintiff does not present any evidence of non-disabled employees who were rotated instead of him for that reason.  The record is devoid of any specific evidence that other non-disabled employees were rotated in

---

[10] The Court also notes that at times, plaintiff appears to admit that he was indeed rotated among positions, and trained for these positions–apparently simply not as often, or to the positions he desired.

the way plaintiff believes he should have been. (*See, e.g.,* Pl. Counter-Statement at ¶ 9 ("While the Defendant did not have a formal policy for rotating employees to different jobs and training them on equipment, it was common for employees who wanted to rotate or train to be given the opportunity.")). Indeed, his allegations in this regard are conclusory.

### 2. Legitimate Nondiscriminatory Reason/Pretext

Even assuming that plaintiff had demonstrated a prima facie case, the burden would shift back to defendant to articulate a legitimate non-discriminatory reason for its decisions. Defendant's burden here is not demanding – it need only offer an explanation for the employment decision. *Bickerstaff*, 196 F.3d at 446. An employee then must come forward with evidence that the proffered reason is a mere pretext for discrimination. If the plaintiff has failed to prove that there is evidence that would permit a rational finder of fact to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate.

ACCO has consistently stated that it has no formal rotation system. Instead, ACCO contends, it placed employees where they were needed and where they were most effective based on production demands. (*See* O'Hara Aff. at ¶8). The Court holds that defendant has, therefore, stated a legitimate nondiscriminatory reason for its decisions regarding rotation. *See Miller v. Saint-Gobain Advanced Ceramics Corp.*, 2004 WL 941798, at *5 (W.D.N.Y. 2004) (concluding that "employers are not required to equally assign undesirable tasks with mathematical precision because there will often be legitimate business reasons for making work assignments that are unrelated to an employee's [protected characteristic]").

Plaintiff has not come forward with evidence to demonstrate that this reason is a mere pretext for discrimination. As noted above, he has been inconsistent with his allegations

regarding whether and when employees were rotated, and has not offered any evidence to show that any of the decisions that the company made in this regard were related to his disability. The Court concludes that defendant has offered a legitimate nondiscriminatory reason for these actions, and that plaintiff cannot show that the reasons were pretext.

**C.    Retaliation**

Plaintiff also contends that he was retaliated against throughout the last few years of his employment, and finally terminated in retaliation for complaining about the treatment he received.

The Second Circuit has adopted the Title VII burden-shifting approach to evaluating retaliation claims under the ADA. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir 1999).

1.    Prima Facie Case

In order to establish a prima facie case of retaliation, a plaintiff must establish that "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Id.* The standard for what constitutes an adverse action in a retaliation claim is different–and less demanding–than in a disparate treatment claim. *See, e.g., Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006). In a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (internal quotation marks omitted).

Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment, through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *De Cintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987). If a plaintiff offers no direct evidence or other circumstantial evidence such as evidence of fellow employees who engaged in similar conduct, the only way that he can establish causation is through an inference created by the temporal proximity between the protected activity and adverse action. *Monclova v. City of New York*, No. CV-05-3164, 2008 WL 822117, at *7 (E.D.N.Y. 2008). Plaintiffs who resort solely to temporal proximity in proving causation must demonstrate the existence of a time frame that is "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).

Plaintiff has not demonstrated that the alleged excessive scrutiny was the result of retaliation. Plaintiff appears to contend that defendant attempted to retaliate against him by disciplining him for violations of work rules #25 and #26–failure to follow specified job instructions and inability or unwillingness to work harmoniously with other employees. Despite the conclusory assertion that the warnings plaintiff was given were retaliatory, plaintiff admits that he engaged in the conduct described; he just believes he should not have been given warnings. The warnings plaintiff received did not closely follow each of his protected activities. Instead, they appear to be scattered throughout his employment, as was his protected activity. Moreover, although plaintiff complains of a few incidents where he received a warning and the co-workers involved did not, based on the evidence presented, the Court is unable to conclude that these co-workers engaged in the same behavior and were similarly situated so as to provide

circumstantial evidence sufficient to establish a causal link.

Similarly, with respect to plaintiff's termination, the Court cannot conclude that the evidence presented establishes a causal link between plaintiff's protected activity and his termination. Even viewing the evidence in the light most favorable to plaintiff, this Court finds that it would be unreasonable to infer, based solely on the temporal proximity between the last of plaintiff's complaints and the termination of his employment, that defendant terminated plaintiff's employment as a result of these complaints. Plaintiff consistently complained throughout his employment, particularly the last five years. He filed multiple complaints with the EEOC, multiple grievances, and finally a lawsuit. ACCO did not terminate plaintiff after any of these actions. Nothing occurred in close timing to the termination that would cause an inference of discrimination based on timing alone. It appears from a review of the record that ACCO was willing to discuss plaintiff's complaints with him, and plaintiff has failed to adduce sufficient evidence to show that ACCO's stated reason for his termination was a mere pretext for retaliation. Without more, in light of the many complaints plaintiff made throughout his employment, a reasonable jury could not find that defendant terminated plaintiff's employment because of these complaints. Furthermore, the court finds no other evidence in the record which might support a causal link between his ongoing complaints and the termination of his employment.

2. <u>Legitimate Nondiscriminatory Reason/Pretext</u>

Even assuming that plaintiff could state a prima facie case of retaliation, the burden simply shifts to the employer to put forth evidence of a non-retaliatory rationale. *See Holt v. KMI-Continental* 95 F.3d 123, 130 (2d Cir. 1996). Once ACCO has done so, to avoid summary judgment, plaintiff must adduce evidence sufficient to raise an issue of fact as to whether the

-13-

employer's reason was merely a pretext for retaliation. *See id.*

Defendant has stated a legitimate nondiscriminatory reason for these warnings (and, as noted above, none led to any adverse employment actions). Many appear to be constructive criticism of plaintiff's work, and others relate to incidents that occurred with co-workers. It is clear that plaintiff did not get along with his co-workers; however, that does not preclude an employer from issuing a warning when such an incident occurs. In order to rebut the employer's legitimate explanation for its actions, plaintiff cannot rest on conclusory allegations. Instead, he must point to specific evidence that would permit a rational factfinder to conclude that defendant had a retaliatory motive. "[M]erely disproving the defendant's legitimate explanation is insufficient; the plaintiff must produce competent evidence that 'the employer's decision was motivated, at least in part, by an intent to retaliate against him.'" *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 447 (S.D.N.Y. 2011) (citation omitted). Plaintiff has not done so. Plaintiff believes that ACCO intended to retaliate against him by criticizing his work, however, his own personal belief is insufficient.

ACCO has stated that plaintiff was terminated as a result of the incident that occurred on June 3, 2013. Following the incident, Ms. Halaquist investigated and obtained statements from the two other employees who were involved and another employee who was present. These employees felt that plaintiff's behavior was moody, paranoid, and threatening. ACCO states that after reviewing the statements and discussing the incident, they decided to terminate plaintiff's employment, "motivated by their obligation to protect other workers . . . ."[11] (Def. Mem. of Law

---

[11] Defendant also states that they were influenced by a letter plaintiff's original counsel had written to the court asking to be relieved as counsel which "reinforced the Company's fears regarding" plaintiff. (Def. Mem. of Law at 17). Plaintiff objects to the use of this letter, claiming that it is privileged. It appears that the decision was based, primarily, on plaintiff's behavior on June 3, 2013, and

at 17). Although plaintiff disputes these employees' version of the incident, it is undisputed that the incident occurred, that he vocally disagreed with a supervisor's decision to move him instead of another employee, that the supervisor seemed upset during their interaction, and that the company reviewed these statements when investigating the incident. The content of the statements demonstrated a pattern of aggressive threatening behavior. Plaintiff clearly believes that his termination was not fair; however, the question is not whether plaintiff has raised a factual issue as to arbitrary or unfair termination–the issue he has a burden to raise is whether he was terminated in retaliation for protected activity. Plaintiff has failed to raise a triable issue as to whether ACCO's reason for his termination was a mere pretext for retaliation.

**D.     Hostile Work Environment[12]**

To demonstrate a hostile work environment, a plaintiff needs to show that "the complained of conduct (1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [disability]." *Giambattista*, 5 F. Supp. 3d 284, 294 (citation omitted, alterations in original). In making this determination, a court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it [was] physically

---

therefore, the Court does not need to rely on this letter.

[12]  The Second Circuit has not yet ruled on whether the ADA recognizes a hostile work environment as an actionable adverse employment action. *See Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) ("Even assuming, *arguendo*, that the ADA provides a basis for a hostile work environment claim (an issue this Court has not yet decided) . . . ."). However, for purposes of this motion, the Court will assume that if a hostile work environment claim is available under the ADA, the same standard would apply as in Title VII cases. *See, e.g., Giambattista v. Am. Airlines*, 5 F. Supp. 3d 284 (E.D.N.Y. 2014).

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993). To show sufficiently severe or pervasive hostility, a plaintiff must "demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted), *superseded on other grounds*. Isolated, minor episodes of harassment do not merit relief. *See, e.g., Bynog v. SL Green Realty Corp.*, No. 05 Civ. 0305, 2007 WL 831740, at *7 (S.D.N.Y. 2007) (concluding that where incidents of being exposed to pornography, touched in an inappropriate manner, and subjected to approximately six comments about race and sex occurred over a two-year term and were infrequent and isolated, plaintiff could not establish that the harassment was sufficiently severe or pervasive to constitute a hostile work environment).

The majority of the incidents about which plaintiff complains are unrelated to his disability.[13] For example, plaintiff complains that co-workers would honk "the horn for inordinate lengths of time, and yell[] at him to get out of the way," apparently implying that this

---

[13] Certainly, some of the incidents about which plaintiff complains are arguably related to his disability. However, these appear to be few and far between–and insufficient to create a hostile work environment for purposes of the ADA. *See, e.g.,* Pl. Counter-Statement at ¶ 10) (complaining that when plaintiff worked in a noisy area, the supervisor complained about having to repeat herself and said "what are you doing up here? You can't hear."); *id.* at ¶ 78-79 (describing employees who were annoyed plaintiff was "bringing '1st shift crap to 2nd shift'" and "hid behind racks as if they feared for their safety" when plaintiff was operating equipment); *id.* at ¶ 82 (alleging that a co-worker wore a Special Olympics T-shirt and "would point to the shirt and the Plaintiff when he saw him"); *id.* at ¶ 124 (asserting that a co-worker mouthed the words "good afternoon, you retarded scumbag"). These comments are not complimentary, but in the context of disability discrimination, they are not particularly severe. They are not physically threatening, did not appear with great frequency, and are not particularly humiliating. The court also notes that plaintiff admitted in his deposition that the employee who wore the Special Olympics T-shirt and mouthed the offensive words to plaintiff did this type of thing to "[p]retty much everybody" and he "didn't like" plaintiff–which undermines plaintiff's theory that this behavior was based on his disability.

was to make fun of his disability.[14] However, in his deposition, when asked if he considered that harassment, he explained "[l]aying on it for a long time until they drive by me, but no. But I mean, you know, is it necessary, you know? The loud noise irritates my ears, and I get headaches and stuff." (Pl. Dep. at 39). Likewise, plaintiff complains of an incident where a co-worker told him "'that's where you belong, at the packing station" and laughed, again attempting to imply that this was related to his disability. However, the court notes that when taken in context of plaintiff's comments at his deposition, this was actually an employee who believed he was a "troublemaker" because he did not want to be rotated among the various positions which began to happen with more frequency after plaintiff filed his EEOC charge. (Pl. Dep. at 119-20). Plaintiff also describes an incident where he told two employees that they should be helping out and "[t]hey became belligerent and told him to mind his own business [and] [p]laintiff saw several other employees watching the incident and laughing." (Pl. Counter-Statement at ¶ 75). Again, there is no indication that this was anything other than two employees being annoyed with a comment plaintiff made or that this was in any way related to plaintiff's hearing problem. Likewise, an employee noticing a perceived error of plaintiff's and explaining it slowly "as if [plaintiff] was born last night," or an employee trying to "push [his] buttons" by bumping into him, does not create a hostile work environment based on his disability. Plaintiff also alleges that someone wrote "'you are gay and like c—k' on [his] paystub." (Pl. Counter-Statement at ¶ 30). To the extent plaintiff raises this to demonstrate that he was subjected to a hostile work environment based on his disability, it is unavailing. Though inappropriate and offensive, like the

---

[14] Plaintiff also complains that employees expressed concerns regarding their safety when plaintiff was engaged in certain tasks. Although plaintiff believes these concerns were unjustified, the court cannot conclude that an employee, even if unjustified, making a comment regarding their safety was causing a hostile work environment for plaintiff.

majority of the other actions and comments plaintiff complains of, it is not related to plaintiff's disability.

The ADA does not require that co-workers become friends. It is clear from the evidence that plaintiff was not happy with his work environment, and frequently was in conflict with his co-workers. It is not clear, however, that any of this conflict or tension was in any way related to plaintiff's disability. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("[I]t is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex."). To prevail on his hostile work environment claim, plaintiff must show that the abusive behavior is rooted in discrimination. *See, e.g., Neratko v. Frank*, 31 F. Supp. 2d 270, 284 (W.D.N.Y. 1998) ("[p]ersonal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a . . . discrimination case by accusation.") (citation and internal quotation marks omitted). Though his work environment may not have been pleasant, "[t]he Supreme Court has stated clearly that the antidiscrimination laws are not to be viewed as a 'general civility code.'" *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 413 (S.D.NY. 2006) (citing *Faragher v. City of Boca Raton*, 524 U.S. at 778).

The conduct complained of is not sufficiently pervasive, is mostly unrelated to plaintiff's disability, did not include offensive language or physical contact, and therefore fails to establish a plausible hostile work environment. After review of the entire record, the court finds no evidence to support plaintiff's claim that he suffered from a hostile work environment based on his disability created by defendants. Consequently, this claim must be dismissed.

## CONCLUSION

Though the Court recognizes that plaintiff found his co-workers and supervisors rude and unfair, that he felt micro-managed, or that he did not like his environment, a rational factfinder could not infer that these personality clashes and general dissatisfaction were based on discrimination or retaliation. Even if criticisms were misplaced, or comments were unfair, viewing the evidence in the light most favorable to plaintiff, his conclusory allegations fail to raise a genuine issue of material fact as to whether defendant discriminated or retaliated against him.

It is therefore

ORDERED that defendant's motion (Dkt. No. 55) for summary judgment dismissing the action is granted; and it is further

ORDERED that defendant's letter motion (Dkt. No. 69) for summary judgment by default is denied as moot; and it is further

ORDERED that the action is dismissed with prejudice.

IT IS SO ORDERED.

Dated: March 31, 2015
       Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge